**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FAYEZ MOHAMMED AHMED
AL KANDARI,

       Petitioner,

       v.

UNITED STATES OF AMERICA, *et al.*,

       Respondents.

Civil Action No. 15-329 (CKK)

---

**CLASSIFIED MEMORANDUM OPINION**
(August 31, 2015)

Petitioner Fayez Mohammed Ahmed Al Kandari petitions this Court for a writ of habeas

corpus and, upon finding that Al Kandari's detention can no longer be justified, order his release

from custody forthwith and direct Respondents to arrange for his immediate repatriation to

Kuwait. Presently before the Court is Respondents' [13] Response to Petition for Writ of Habeas

Corpus and Motion to Dismiss or for Judgment as a Matter of Law.[1] Upon consideration of the

pleadings[2], the relevant legal authorities, and the record as a whole, the Court DENIES

---

[1] Respondents' Response to Petition for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law contains classified information, which the Court has reviewed. *See* Resps.' Not. of Classified Filing, ECF No. [11]. Respondents also filed a public, redacted version of the pleading. *See* Resps.' Not. of Public Filing, ECF No. [13]. While the Court considers the classified information provided by Respondents in reaching its decision, the Court shall cite to the public, redacted version of the pleading and other documents whenever possible throughout this Memorandum Opinion.

[2] Pet. For Writ of Habeas Corpus, ECF No. [1] ("Pet."); Resp. to Pet. for Writ of Habeas Corpus and Mot. to Dismiss or for J. as a Matter of Law, ECF No. [13-1] ("Resps.' Mot."); Petr.'s Opp'n to Resps.' Resp. to Pet. for Writ of Habeas Corpus and Mot. to Dismiss or for J. as a Matter of Law, ECF No. [16] ("Petr.'s Opp'n"); Resps.' Reply in Supp. of Mot. to Dismiss or for J. as a Matter of Law, ECF No. [19] ("Resps.' Reply"); Resps.' Notice of Supp. Filing, ECF No. [21] ("Resps.' Supp."); Petr.'s Resp. to Resps.' Not. of Supp. Auth., ECF No. [22] ("Petr.'s

1

Petitioner's [1] Petition for Writ of Habeas Corpus and GRANTS Respondents' [13] Response to Petition for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law. Accordingly, this action is DISMISSED in its entirety.

## I. BACKGROUND

### A. Factual Background

Petitioner Fayez Mohammed Ahmed Al Kandari ("Al Kandari") is a Kuwaiti citizen who has been detained since 2001 and has been in the custody of U.S. military forces in Guantanamo Bay, Cuba since 2002. Pet. ¶ 2. Respondents, the United States of America, President Barack H. Obama, U.S. Secretary of Defense Ashton B. Carter, and Rear Admiral Kyle J. Cozad, are allegedly responsible for Petitioner's detention. *Id.* ¶ 3.

Petitioner was born in Kuwait City, Kuwait in 1975. He studied at college in Kuwait and Ras al-Khaimah, United Arab Emirates, before returning home in or around 2001. *Id.* ¶ 7. In June 2001, Petitioner traveled to Pakistan and in August 2001, to Afghanistan. *Id.* Petitioner traveled first to Kandahar, then to Kabul, then to a village outside Kabul, then back to Kabul, and finally to Jalalabad. *Id.* ¶¶ 7-8. Petitioner was taken captive by Afghan villagers near Tora Bora in December 2001, and was subsequently turned over to U.S. military forces. *Id.* ¶ 8. Petitioner was transferred to the detention facility at Guantanamo in August 2002 and has remained in custody there for more than thirteen years. *Id.* ¶ 9.

In May 2002, Al Kandari petitioned this Court for a writ of habeas corpus on grounds that he was not, in fact, an enemy combatant and that his detention was therefore unlawful. *Id.* ¶ 12. Although he denied taking any part in hostilities against the United States or its allies, on September 15, 2010, after a five-day merits hearing, this Court denied his petition and held that,

---

Resp."). In an exercise of its discretion, the Court finds that holding oral argument on the instant motion and petition would not be of assistance in rendering a decision. See LCvR 7(f).

2

based on the preponderance of the evidence, more likely than not Petitioner had been part of Al Qaeda, the Taliban, or their associated enemy forces operating in Afghanistan, and therefore had been properly classified and detained as an enemy combatant pursuant to the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001). *Id.* ¶¶ 12-15; *Al Kandari v. United States*, 744 F. Supp. 2d 11 (D.D.C. 2010). This Court found that "by Al Kandari's own admission, he was aware that the individuals he chose to associate with while in Tora Bora were members of and were associated with al Qaeda and/or the Taliban." *Al Kandari*, 744 F. Supp. 2d at 47.

This Court found Al Kandari's explanations of the relevant facts "implausible," noting that "it defies common sense that al Qaeda, the Taliban, or their associated enemy forces, would permit an unknown and untested noncombatant, armed with a Kalishnikov rifle, to wander through Tora Bora and to interact with its fighters and their leaders, all the while the Battle of Tora Bora raged on around them." *Id.* at 46. "To the contrary, that al Qaeda, the Taliban, and its associated enemy forces, permitted Al Kandari to associate with and be near their members while they were actively engaged in fighting Coalition forces makes it more likely than not that he himself was also part of the forces associated with al Qaeda and/or the Taliban." *Id.* On December 9, 2011, the D.C. Circuit affirmed this Court's decision in an unpublished opinion. *Al Kandari v. United States*, 462 Fed. App'x 1 (D.C. Cir. 2011). On June 11, 2012, the Supreme Court of the United States denied Petitioner's petition for writ of certiorari. *Al Kandari v. United States*, 132 S. Ct. 2741 (2012). Petitioner indicates that he "continues to deny that he became part of the Taliban, Al Qaeda and/or associated forces, or that he is properly classified as an enemy combatant, [however] he accepts for purposes of the instant action that this Court's prior factual findings are conclusive and does not seek to re-litigate them." Pet. ¶ 18.

3

Rather, Petitioner now argues that Respondents have ended active combat in Afghanistan and, as a result, Petitioner is entitled to immediate release and repatriation to Kuwait. *Id.* ¶¶ 27-32. In his 2015 State of the Union Address, Respondent President Barack Obama stated, "Tonight for the first time since 9/11, our combat mission in Afghanistan is over." *Id.* ¶ 30. Petitioner notes that Respondents have taken concrete steps to implement the withdrawal of U.S. troops, including transferring control over U.S. detention facilities housing Afghan detainees at Bagram to the Afghan government and turning over the last 95 Afghan districts to Afghan security control. *Id.* ¶ 31. Petitioner states that "[c]ombat operations in Afghanistan are over, both as a matter of fact and as declared by the Commander-in-Chief." *Id.* ¶ 32.

### B. Procedural History

On March 6, 2015, Petitioner filed a Petition for Writ of Habeas Corpus. Petitioner asks that this Court order his immediate release and repatriation to Kuwait. *Id.* ¶ 41. Petitioner seeks his release from detention pursuant to the Great Writ as preserved by the United States Constitution, Art. I, § 9, and the federal habeas corpus statute, which is codified at 28 U.S.C. § 2241, *et seq. Id.* ¶ 4. Petitioner asserts that combat operations in Afghanistan have concluded at this time and, as such, his continued detention at Guantanamo is no longer lawful under the AUMF. *Id.* ¶¶ 41-42.

Respondents subsequently filed a Response to Petition for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law. Petitioner then filed an Opposition, and Respondents filed a Reply. In addition, on August 7, 2015, Respondents filed a Notice of Supplemental Authority, directing this Court to the recent decision of Senior District Judge Royce C. Lamberth in *Al Warafi v. Obama,* No. 09-2386, 2015 WL 4600420 (D.D.C. Jul. 30, 2015). On August 27, 2015, Petitioner filed a Response to Respondents' Notice of Supplemental

4

Authority, contending that his arguments differ from those of the petitioner in *Al Warafi* and, accordingly, the instant action is distinguishable.

## II. LEGAL STANDARD

The Government derives its authority to detain Al Kandari from the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001). The AUMF provides:

> That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2, 115 Stat. 224, 224 (2001). This provision gives the United States government the authority to detain a person who is found to have been "part of" Al Qaeda or Taliban forces. *See Awad v. Obama*, 608 F.3d 1, 11-12 (D.C. Cir. 2010), *cert denied* 131 S. Ct. 1814 (2011); *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010), *cert. denied* 131 S. Ct. 1814 (2011); *see also Barhoumi v. Obama*, 609 F.3d 416, 423-24 (D.C. Cir. 2010). Here, Petitioner was determined by this Court to have been part of al Qaeda, the Taliban, or their associated enemy forces. *See Al Kandari v. United States*, 744 F. Supp. 2d 11, 48 (D.D.C. 2010), *aff'd*, 462 Fed. App'x 1 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 2741 (2012). As such, this Court found that Petitioner was lawfully detained pursuant to the President's authority under the AUMF. *Id.*

The issue in the instant Petition is the permissible duration of detention, a point to which the AUMF is silent. In a plurality opinion of the Supreme Court of the United States in *Hamdi v. Rumsfeld*, the Court held that Congress' "grant of authority for the use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict." 542 U.S. 507, 521 (2004). Further, the Supreme Court explained that "[t]he United States may detain

5

∎

[enemy combatants] for the duration of these hostilities." *Id.* In 2012, Congress affirmed the President's authority of under the AUMF to detain covered persons "until the end of the hostilities." *See* Fiscal Year 2012 National Defense Authorization Act, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) (codified at 10 U.S.C. § 801 note). In 2014, the United States Court of Appeals for the District of Columbia Circuit reaffirmed that "under the Authorization for the Use of Military Force . . . individuals may be detained at Guantanamo so long as they are determined to have been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing." *Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) (internal citations omitted).

### III. DISCUSSION

The sole issue before the Court is whether Petitioner, who has been classified as an enemy combatant, may continue to be detained at Guantanamo Bay pursuant to the AUMF in light of the current status of the United States' military presence in Afghanistan. As discussed further *infra*, the parties disagree as to the relevant inquiry for determining whether detention authority remains. Moreover, the parties dispute the proper role of this Court in making the determination as to whether the Government's detention authority remains pursuant to the AUMF.

Indeed, Petitioner argues that the Court, relying solely on the words of the President, must find that Petitioner's detention is no longer lawful under the AUMF and, accordingly, must issue an order for Petitioner's immediate release. In contrast, Respondents argue that the Court, relying solely on the words and actions of officials in the executive and legislative branches of government, must find that active hostilities are ongoing and, accordingly, must find that

6

■

Petitioner's continued detention is authorized under the AUMF. Furthermore, both parties argue that their cited evidence unequivocally supports their respective position.

The Court shall first briefly address the parties' argument that the Court must defer exclusively to the other branches of government with respect to the issue of whether "active hostilities" are ongoing. Next, the Court shall discuss the appropriate standard of review and the merits of each party's argument.

## A. Judicial Review in this Proceeding

Both parties appear to assert that the Court should defer to the statements of elected and/or government officials, and, as such, that the Court does not have a role in independently determining whether "active hostilities" remain ongoing in Afghanistan. Petitioner asserts that "by declaring combat operations and the war to be over and by signing an agreement with Afghanistan, the Commander in Chief has eliminated the legal predicate for continued detention under the law of war." Petr.'s Opp'n at 3. Further, Petitioner argues that Supreme Court precedents "require this Court to defer to the President's determination as to the end of hostilities," *id.* at 4, and, accordingly, "[t]he Court should reject the Department of Justice's invitation to substitute its judgment (and the judgment of a subordinate officer) for that of the Commander in Chief," *id.* at 5.

In contrast, Respondents argue that "the determination of whether hostilities have ended is a matter 'of political judgment for which judges have neither the technical competence nor official responsibility.'" Resps.' Mot. at 2 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948)). Respondents assert that Congress and the Executive are in agreement that active hostilities against al-Qaeda, the Taliban, and associated forces have not ceased at this time. *Id.* at 26. Moreover, Respondents indicate that "the United States continues to conduct certain military

7

■

operations in Afghanistan, including support of Afghan forces in their combat activities and counterterrorism operations against al-Qaeda, Taliban, and associated forces, where appropriate, in order to prevent these groups from [threatening] U.S. targets or the homeland." *Id.* Respondents argue that a finding by this Court that active hostilities have ceased at this time "would raise serious separation of powers concerns on a question of national security." *Id.* at 32.

The D.C. Circuit has explained: "The determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war." *Al-Bihani*, 590 F.3d at 874; *see also Ludecke v. Watkins*, 335 U.S. 160, 170 (1948). However, this directive provides only some guidance when, as here, the parties disagree as to whether active hostilities have ceased based on the statements of the Executive. However, for the reasons described below, the Court need to fully address Respondents' separation-of-powers argument because the Court agrees with Respondents' asserted position that the active hostilities remain ongoing in Afghanistan. Moreover, the Court need not fully analyze Petitioner's claim that it must defer to the President at this time because the Court finds that the President has not declared the end of active hostilities.

However, the Court shall briefly address its role because it is relevant to the issue at hand. Here, the parties dispute whether Petitioner's detention is lawful, both arguing that the President's and/or other government officials' statements regarding the status of the relevant conflict support their respective positions. As such, this Court serves the limited role of determining which party prevails in the face of such a dispute raised through a habeas proceeding based on the record before it.

8

■

The D.C. Circuit has explained, "[I]n a detainee case, the judge acts as a neutral decisionmaker charged with seizing the actual truth of a simple, binary question: is detention lawful?" *Al-Bihani*, 590 F.3d at 880. Seemingly, the crux of Respondents' argument appears to be that this Court, having already found that Petitioner meets the criteria for detention pursuant to the AUMF, no longer serves in the role of decisionmaker because the Government has the authority to detain Petitioner until the Government determines that active hostilities have ceased. However, "as critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat." *Hamdi*, 542 U.S. at 530. As the Supreme Court explained:

> The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply. Even when the United States acts outside its borders, its powers are not "absolute and unlimited" but are subject "to such restrictions as are expressed in the Constitution." Abstaining from questions involving formal sovereignty and territorial governance is one thing. To hold the political branches have the power to switch the Constitution on or off at will is quite another. The former position reflects this Court's recognition that certain matters requiring political judgments are best left to the political branches. The latter would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say "what the law is."

*Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (internal citation omitted). Here, however, the Court need not address the contours of the appropriate judicial inquiry because the Court finds that the evidence supports Respondents' position and the Court declines to accept the Petitioner's interpretation of the President's statements.

**B. Petitioner's Continued Detention Under the AUMF**

9

The narrow issue raised by Petitioner is whether his continued detention remains authorized under the AUMF in light of the President's recent statements regarding the status of military operations in Afghanistan. As an initial matter, the Court must first address the standard of review as it is has not been fully set forth by either party in its briefing. Next, the Court shall discuss the evidence set forth by each party.

### 1. *Standard of Review*

Pursuant to the Amended Case Management Order adopted by this Court as well as other courts in this district in prior habeas proceedings brought by Guantanamo detainees, the Government bears the burden of proving by a preponderance of the evidence that Al Kandari is lawfully detained. *See In re Guantanamo Bay Detainee Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008) ("The government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful.") (citing *Boumediene*, 553 U.S. at 787) ("The extent of the showing required of the Government in these cases is a matter to be determined."). The D.C. Circuit has affirmed that "a preponderance of evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay, Cuba." *Awad*, 608 F.3d at 10; *see also Al Odah v. United States*, 611 F.3d 8, 13 (D.C. Cir. 2010), *cert. denied* 131 S. Ct. 1812 (2011) ("It is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF."). Accordingly, the burden of proof has remained on the Government at all times. The Government must come forward with evidence demonstrating by a preponderance of the evidence that Al Kandari is lawfully detained, and if the Government fails to meet this burden, the Court must grant Al Kandari's petition for habeas corpus. The Court sees no reason to stray from this standard nor has either party set forth a basis for the Court to do so.

10

In a footnote, Petitioner argues that all facts alleged in the Petition must be taken as true and all reasonable inferences must be drawn in Petitioner's favor because Respondents have moved for a dismissal or for judgment as a matter of law. Petr.'s Opp'n at 4 n.2. Respondents argue that given the nature of the proceeding, district judges in this court "have consistently resolved issues in Guantanamo habeas cases through motions for judgment in which each party submits evidence for the Court's consideration, as is appropriate." Resps.' Reply at 2-3 n.1. Indeed, "[t]he Supreme Court has provided scant guidance on these questions, consciously leaving the contours of the substantive and procedural law of detention open for lower courts to shape in a common law fashion." *Al-Bihani*, 590 F.3d at 870. "This primacy of independence over process is at the center of the [Supreme Court's] *Boumediene* opinion, which eschews prescribing a detailed procedural regime in favor of issuing a spare but momentous guarantee that a 'judicial officer must have adequate authority to make a determination in light of the relevant law and facts.'" *Id.* at 880. As such, the Court is not restricted to follow the standard for addressing motions to dismiss and motions for judgment as a matter of law as required in a civil action outside of the habeas context. Moreover, the Court notes that even viewing the evidence in the light most favorable to the Petitioner and drawing all reasonable inferences in Petitioner's favor, Petitioner's claim still fails.

### 2. *Petitioner's Detention is Lawful Under the AUMF*

Turning to the heart of the issue before the Court, Petitioner argues that his detention is no longer lawful under the AUMF. The facts underlying Petitioner's claim are undisputed by the parties. On June 22, 2011, the President announced a plan to move U.S. troops out of Afghanistan starting later that year and continuing through 2014. Resps.' Mot., Ex. 5 at 1 (Remarks by the President on the Way Forward in Afghanistan, Jun. 22, 2011). On March 27,

11

2014, the President announced: "Together with our allies and the Afghan government, we have agreed that this is the year we will conclude our combat mission in Afghanistan." *Id.*, Ex. 6 at 1 (Statement by the President on Afghanistan, May 27, 2014). On September 30, 2014, the United States and the Islamic Republic of Afghanistan entered into the Security and Defense Cooperation Agreement ("Bilateral Security Agreement"), which governs the United States' involvement in Afghanistan on and after January 1, 2015. *See generally id.*, Ex. 8 (Bilateral Security Agreement). In general, the Bilateral Security Agreement provides:

> The Parties shall continue to foster close cooperation to strengthen security and stability in Afghanistan, counter terrorism, contribute to regional and international peace and stability, and enhance the ability of Afghanistan to deter internal and external threats against its sovereignty, security, territorial integrity, national unity, and its constitutional order. Unless otherwise mutually agreed, United States forces shall not conduct combat operations in Afghanistan.

*Id.* at 5. On January 1, 2015, the United States formally ended its Operation Enduring Freedom combat mission in Afghanistan and commenced a new support counterterrorism mission, Operation Freedom's Sentinel. *Id.*, Ex. 1 (News Release, Dec. 28, 2014). There are two primary components to Operation Freedom's Sentinel: (1) training, advising, and assisting the Afghan National Security Forces ("ANSF") to assist the Afghan government in its effort to establish a secure and stable country; and (2) a counter-terrorism mission directed against al-Qaeda, persons providing support to al-Qaeda, and persons engaged in hostilities against the United States and coalition forces in Afghanistan. *Id.*, Ex. 10 at ¶¶ 7-8 (Declaration of Rear Admiral, U.S. Navy, Sinclair M. Harris, Apr. 14, 2015) (unclassified version). Presently, approximately 9,800 uniformed U.S. military personnel are authorized in Afghanistan in support of Operation Freedom's Sentinel. *Id.* ¶ 6.

12

Petitioner argues that these events along with the recent public statements of the President and Administration national security officers unequivocally demonstrate that the war in Afghanistan is over. *See* Petr.'s Opp'n at 6-7. Indeed, on December 28, 2014, the President stated, "[T]hanks to the extraordinary sacrifices of our men and women in uniform, our combat mission in Afghanistan is ending, and the longest war in American history is coming to a responsible conclusion." *Id.*, Ex. 5 at 2 (Statement by the President on the End of the Combat Mission in Afghanistan, Dec. 28, 2014). At the State of the Union address delivered on January 20, 2015, the President declared, "Tonight, for the first time since 9/11, our combat mission in Afghanistan is over." *Id.*, Ex. 1 at 2 (Remarks by the President in State of the Union Address, Jan. 20, 2015). However, notably, none of these statements nor the other statements relied on by Petitioner discuss the end of "active hostilities." Rather, the statements indicate that the war is "coming to a responsible conclusion," and note the end of the "combat mission" and the "ground war." *See also Id.*, Ex. 2 at 3 (Remarks by the President at Farewell Tribute in Honor of Secretary of Defense Chuck Hagel, Jan. 28, 2015) ("After more than 13 years, our combat mission in Afghanistan is over, and America's longest war has come to a responsible and honorable end."); *id.*, Ex. 7 at 1 (Press Conference by Secretary Hagel at NATO Headquarters, Brussels, Belgium, Feb. 5, 2015) ("In Afghanistan, just over a month ago, NATO partners and allies ended our combat mission, the longest and most complex in the alliance's history."); *id.*, Ex. 8 at 2 (Remarks by National Security Advisor Susan Rice on the 2015 National Security Strategy, Feb. 6, 2015) ("We've brought home almost 170,000 American troops, responsibly ending two long and costly ground wars and re-purposing our military strength so we can better respond to emerging threats and crises."); *id.*, Ex. 9 at 2 (Remarks by the President at Signing of the Clay Hunt SAV Act, Feb. 12, 2015) ("After 13 years, our combat mission in Afghanistan is

13

■

over, and a new generation of veterans is coming home."); *id.*, Ex. 10 at 3 (Remarks by President Obama and President Ghani of Afghanistan in Joint Press Conference, Mar. 24, 2015) ("So with a new government in Afghanistan and with the end of our combat mission, this visit is an opportunity to begin a new chapter between our two nations."); *id.*, Ex. 3 at 2 (National Security Strategy, Feb. 2015) ("In Afghanistan, we have ended our combat mission and transitioned to a dramatically smaller force focused on the goal of a sovereign and stable partner in Afghanistan that is not a safe haven for international terrorists.").

Respondents contend that although the United States has ended its combat mission and transitioned into a new phase of military operations in Afghanistan, this shift does not mark the end of active hostilities in Afghanistan and notes that fighting continues. *See* Resps.' Mot. at 22. Instead, Respondents assert that "military operations remain active and ongoing in 2015, as reflected by the repeated occasions in which hostile action by U.S. forces has been required in recent months." *Id.* at 20.

Further, Respondents contend that to determine whether active hostilities are ongoing, the actions of the Taliban, al-Qaeda, and associated forces must be considered in addition to the actions of the United States. *Id.* at 23. Indeed, Respondents cite to a host of recent activity in Afghanistan both on the part of the United States and on the part of al-Qaeda, the Taliban, and/or associated forces, *id.* at 12-18, to support their position that "there is no legal or factual basis on which to conclude that active hostilities between the United States and these groups have ceased," *id.* at 23.

14

"The Geneva Conventions require release and repatriation only at the 'cessation of active hostilities.'"[3]  *Al-Bihani*, 590 F.3d at 874 (citing Third Geneva Convention art. 118).  As this Court has noted, "The Supreme Court and the D.C. Circuit have repeatedly held that detention under the AUMF is lawful for the duration of active hostilities." *Al Odah v. United States*, 62 F. Supp. 3d 101, 114 (D.D.C. 2014); *see also Hamdi*, 542 U.S. at 520 ("It is a clearly established principle of the law of war that detention may last no longer than active hostilities.").

Petitioner makes several arguments with respect to the meaning and applicability of the "active hostilities" standard in the instant action.  First, Petitioner argues that "active hostilities" have ceased by definition because the term is a limiting principle applicable only to a war that has not yet been declared over.  Petr.'s Opp'n at 11.  Here, Petitioner argues that the war has been declared over by the President and, thus, the case law does not support the interpretation that "active hostilities" can be ongoing when a war is over.  Second, Petitioner argues that detention is only permissible for the duration of the relevant conflict.  Here, Petitioner contends that the relevant conflict, Operation Enduring Freedom, has been declared over. *Id.* at 12.  Finally, Petitioner contends that the term "active hostilities" has been defined as coextensive of active combat operations.  Pet. ¶ 36; Petr.'s Opp'n at 1, 11.  Here, Petitioner argues that active hostilities have ceased because active combat operations have ceased.  Petr's Opp'n at 11.  For the reasons described herein, the Court finds each of the Petitioner's claims without merit. Moreover, applying the relevant legal authority to the facts of this case, the Court finds that Petitioner's detention remains lawful under the AUMF because active hostilities remain ongoing.

Petitioner first argues that active hostilities cannot be ongoing because the war itself has been declared over.  While Petitioner relies on statements indicating that the United States is no

---

[3] Article 118 of the Third Geneva Convention provides: "Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities."

15

longer engaged in "active combat," except when agreed upon by the parties pursuant to the Bilateral Security Agreement, that the "combat mission" is over, and that the "ground war" and "war" has ended, the Court rejects Petitioner's contention that these statements address the relevant inquiry before this Court. Indeed, these statements do not necessarily signal the end of "active hostilities," and notably no evidence has been presented that any government official, including the President, has stated that there has been an end to active hostilities in Afghanistan. Moreover, Respondents provided evidence that the President has authorized the assignment of 9,800 uniformed U.S. military personnel in Afghanistan and described the two primary components of their mission.

Next, relying on Justice Sandra Day O'Connor's opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), Petitioner argues that the end of Operation Enduring Freedom marks the end of the particular conflict in which Petitioner was captured. *See* Petr.'s Opp'n at 10. Justice O'Connor, writing for the plurality, explained: "We conclude that detention of individuals falling into the limited category we are considering, *for the duration of the particular conflict in which they were captured*, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use [pursuant to the AUMF]." *Id.* at 518 (emphasis added). Here, Petitioner characterizes Operation Enduring Freedom as the "particular conflict" relevant to his detention and contends that since Operation Enduring Freedom has ended, Petitioner's release is required. Petr.'s Opp'n at 12. The Court rejects Petitioner's argument that the relevant conflict is Operation Enduring Freedom. Rather, the relevant conflict at issue in the instant action is the conflict in Afghanistan involving al-Qaeda, the Taliban, and its associated enemy forces. As such, the fact that there has been a transition from Operation Enduring Freedom to Operation Freedom's Sentinel does not

16

■

necessarily signal the end of the "particular conflict." Moreover, as discussed further below, the Court concludes that the "particular conflict in which [Petitioner] was captured" is ongoing based on the information provided by Respondents regarding the current status of military operations in Afghanistan. *See Hamdi*, 542 U.S. at 518.

Finally, Petitioner argues that a reading of the case law demonstrates that active hostilities are coextensive of active combat and, here, active combat has ceased. Petitioner contends, "For the plurality [in *Hamdi*], 'active combat operations,' which the Government concedes have ended, define the scope of the relevant conflict and provide the necessary predicate for detention." Petr.'s Opp'n at 12. In support of this assertion, Petitioner cites the following passage from the plurality opinion in *Hamdi*:

> [W]e understand Congress' grant of authority for the use of "necessary and appropriate force" to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles. If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel. But that is not the situation we face as of this date. Active combat operations against Taliban fighters apparently are ongoing in Afghanistan.

*Hamdi*, 542 U.S. at 521. Petitioner contends that this portion of the opinion signifies that detention is no longer authorized after the end of active combat operations. Petr.'s Opp'n at 12.

The Court disagrees with Petitioner's reading of *Hamdi*. In noting that this particular conflict differs from those of the past, the plurality in *Hamdi* simply found that detention was authorized because active combat operations were ongoing. However, the plurality only stated that the detention authority affirmatively exists during active combat and did not state that such authority ceases if active combat ends. *C.f. Hamdi*, 542 U.S. at 521 ("If the record establishes that United States troops are still involved in active combat in Afghanistan, those detentions are

17

■

part of the exercise of 'necessary and appropriate force,' and therefore are authorized by the AUMF."). Moreover, while the plurality in *Hamdi* did caution that the facts of a particular conflict may unravel the Court's understanding of the Government's authority to detain enemy combatants, the Court does not agree with Petitioner that such a situation exists at this point in time. *See id.*; *Rasul v. Bush*, 542 U.S. 466, 488 (2004) (Kennedy, J., concurring) ("Perhaps, where detainees are taken from a zone of hostilities, detention without proceedings or trial would be justified by military necessity for a matter of weeks; but as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker."). As discussed further *infra*, Respondent has set forth sufficient evidence in the instant action to demonstrate that Petitioner's detention is lawful under the relevant legal standard.

Petitioner's reliance on the language regarding "active combat" is misplaced. Notably, the plurality in *Hamdi* specified, "It is a clearly established principle of the law of war that detention may last no longer than *active hostilities*." *Hamdi*, 542 U.S. at 520 (emphasis added). Moreover, the plurality expressly indicated: "The United States may detain, for the *duration of these hostilities*, individuals legitimately determined to be Taliban combatants who 'engaged in an armed conflict against the United States.'" *Id.* at 521 (emphasis added). As such, the issue before the Court is whether active hostilities, rather than active combat, remain ongoing. *See, e.g., Ali v. Obama*, 736 F.3d 542, 552 (D.C. Cir. 2013), *cert. denied* 135 S. Ct. 118 (2014) ("[T]he 2001 AUMF does not have a time limit, and the Constitution allows detention of enemy combatants for the duration of hostilities.").

In 2010, the D.C. Circuit in *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), provided some guidance into the relevant inquiry in this matter. The D.C. Circuit explained:

> That the [Geneva] Conventions use the term "active hostilities" instead of the terms "conflict" or "state of war" found elsewhere in the document is significant.

18

■

It serves to distinguish the physical violence of war from the official beginning
and end of a conflict, because fighting does not necessarily track formal timelines.
The Conventions, in short, codify what common sense tells us must be true:
*release is only required when the fighting stops.*

*Al-Bihani*, 590 F.3d at 874 (internal citations omitted) (emphasis added). Factually, the parties
appear to agree that the United States has announced a formal end to combat operations
notwithstanding the provisions of the Bilateral Security Agreement. However, it is also clear
that U.S. military forces remain and that fighting is ongoing in Afghanistan. Indeed, with respect
to the status of U.S. military operations in Afghanistan, the President issued a letter on June 11,
2015, to Congress indicating: "The United States currently remains in an armed conflict against
al-Qa'ida, the Taliban, and associated forces, and active hostilities against those groups remain
ongoing." Resps.' Reply, Ex. 42 at 3 (Letter from the President – Six Month Consolidated War
Powers Resolution Report, Jun. 11, 2015).

Respondents also provided the Court with a declaration from Sinclair M. Harris, Rear
Admiral, United States Navy, who has served as the Vice Director of Operations for the Joint
Chiefs of Staff at the Pentagon since April 28, 2014. *See* Resps.' Mot., Ex. 10 at ¶ 1
(Declaration of Rear Admiral, U.S. Navy, Sinclair M. Harris, Apr. 14, 2015) (classified version).
Rear Admiral Harris explained:

OFS [Operation Freedom's Sentinel] is executed under specified rules of
engagement that delineate the circumstances and conditions under which U.S.
forces may engage:

The President has authorized 9,800 U.S.
uniformed military personnel to be present in Afghanistan today,
in support of this new mission.

19

*Id.* ¶ 6. Rear Admiral Harris also described the first prong of the U.S. military presence under

Operation Freedom's Sentinel:

> United States military personnel support the RS mission [NATO's Operation
> Resolute Support] by conducting security force assistance (SFA) operations.



*Id.* ¶ 7. With respect to Operation Freedom's Sentinel generally, Rear Admiral Harris explained:

*Id.* ¶ 9.



From January 2015 to the present,
there have been numerous, specific instances of hostile forces, including the
Taliban and Al-Qaeda, attacking or planning to attack U.S. personnel and
facilities in Afghanistan.

*Id.* ¶ 12. Further, Rear Admiral Harris described:

20

*Id.* ¶ 14. Finally, Rear Admiral Harris explained:



*Id.* ¶ 15.

A review of the documents submitted by the Respondents supports the President's assertion that fighting has not stopped in Afghanistan and that active hostilities remain ongoing at this time. As such, the Court finds that the Government has established by a preponderance of the evidence that Petitioner's detention is lawful under the AUMF because active hostilities against al-Qaeda, the Taliban, and associated forces in Afghanistan remain ongoing.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner's [1] Petition for Writ of Habeas Corpus is DENIED and Respondents' [13] Response to Petition for Writ of Habeas Corpus and Motion to Dismiss or for Judgment as a Matter of Law is GRANTED. Accordingly, this action is DISMISSED in its entirety. Petitioner's claim for relief is DISMISSED WITHOUT PREJUDICE. An appropriate Order accompanies this Memorandum Opinion.

Dated: August 31, 2015

                                        /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

21